22-MJ-6136-MPK
22-MJ-6137-MPK

## <u>AFFIDAVIT OF SPECIAL AGENT BRIAN HIGGINS</u>

I, Brian Higgins, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed since 2009. I am responsible for the investigation and enforcement of federal firearms laws. I am presently assigned to the U.S. Marshal Service/HIDTA Fugitive Task Force. In addition, I focus on crimes of violence perpetrated by felons and otherwise prohibited persons who illegally possess and/or purchase firearms, criminal organizations, gangs, and narcotics trafficking groups in urban areas. Additionally, I have participated in numerous investigations focusing on narcotics trafficking, street gangs, and illegal firearms.[1]

2.      During my tenure with ATF, I have written and/or participated in the execution of numerous state and federal search warrants, and have debriefed many defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized me with: (1) The manner in which illegal guns are brought into Massachusetts and sold; (2) Firearm and narcotics traffickers' methods of operation, including their acquisition, storage, and transportation of both illegal guns and drugs; and, (3) The utilization of cellular telephones to facilitate such activities.

3.      In addition to this training, I have had extensive experience investigating firearms and

---

[1] On July 28, 2016, in connection with an extension of a civil restraining order in an unrelated domestic matter, Judge Marianne C. Hinkle made an adverse credibility finding against the affiant. *Higgins v. Higgins*, Docket No. 1653R00364, Woburn District Court.

drug traffickers. Since joining the ATF, I have participated in scores of gun trafficking investigations as a case agent, acting in an undercover capacity, and in a subsidiary role. I have also personally participated in many aspects of narcotics investigations, including surveillance, using confidential informants and cooperating witnesses, and writing and executing search warrants.

## PURPOSE OF AFFIDAVIT

4.      I submit this affidavit in support of:

   a)  A search warrant for 20 Boston Street, Apartment 1, Haverhill, Massachusetts (the "Target Location"). A complete description of the Target Location is set forth in Attachment A-1, which is attached hereto and incorporated herein. As will be discussed below, the Target Location is the residence of Jesus Joel GARCIA-TORRES ("GARCIA-TORRES"); and

   b)  A search warrant for GARCIA-TORRES's vehicle, a red 2019 Honda HR-V, bearing Massachusetts registration 2WSW44, (the "Target Vehicle"). The vehicle is registered to GARCIA-TORRES at the Target Location. A complete description of the Target Vehicle is set forth in Attachment A-2, which is attached hereto and incorporated herein.

5.      As will be further discussed below, there is probable cause to believe that GARCIA-TORRES is engaged in illegal dealing in firearms without a license, in violation of 18 U.S.C. 922(a)(1) and is a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) (collectively, the "Target Offense"). As a result, I submit there is probable cause to believe that the Target Location and Target Vehicle will contain evidence of the Target Offenses, as described in Attachment B.

6.      The facts set forth is this affidavit are based on my personal knowledge, my training and experience, information provided to me by other law enforcement officers and federal agents, and my review of records described herein. This affidavit is submitted for the limited purpose of establishing probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBALE CAUSE

### Background of the investigation

GARCIA-TORRES' first attempt to purchase a firearm

7.      During the month of June 2020, Task Force Officer ("TFO") Trooper Sean Healy posted a photograph of a firearm to a social media platform utilizing an undercover account. GARCIA-TORRES, a convicted felon subsequently contacted TFO Healy in relation to the aforementioned firearm. TFO Healy subsequently sent my undercover ("UC") telephone number to GARCIA-TORRES. In June 2020, GARCIA-TORRES remained unidentified and was known only by aliases.

8.      On June 17, 2020, GARCIA-TORRES, using (978) 398-4343, sent text messages to my UC telephone and identified himself as "Joey" or "G."[2]  GARCIA-TORRES conveyed that he was provided the UC telephone number by a third party and was interested in buying a "toy." Based on my training and experience, and knowledge of the posting of a firearm to TFO Healy's undercover account, I believe that GARCIA-TORRES was seeking to purchase a firearm (a "toy"). During that same conversation, GARCIA-TORRES asked me, "What u got for 6-700. 5-700**." I believe GARCIA-TORRES inquired about what firearms I had available for sale between $500 to $700. GARCIA-TORRES further stated, "Yeah to the flips, lmao I got my persona jawn I just like buying

_____

[2] As will be discussed below, GARCIA-TORRES later self-identified as the user of (978) 398-4343.

shit selling might keep it if its [sic] nice who knows. Lol." Based on my training, experience, and knowledge of the investigation, I believe that GARCIA-TORRES was interested in buying and selling firearms ("Yeah to the flips"). I further believe that he has owned a personal firearm ("I got my persona jawn"). I further believe that he preferred buying and selling firearms ("I just like buying shit selling"). I believe, however, that GARCIA-TORRES was not opposed to keeping firearms that he liked ("Might keep it if its nice, who knows.").

9.     On June 23, 2020, GARCIA-TORRES contacted me again on the UC telephone and texted, "We need to link asap."  I believe that GARCIA-TORRES wanted to purchase a firearm from me as soon as possible.   The following day GARCIA-TORRES sent text messages to the UC telephone stating, "Tryna cop" and "Asap n****s ran off with 2 oz of exotic." I believe that GARCIA-TORRES was interested in purchasing a firearm ("Tryna cop") from me in my undercover capacity. I further believe that GARCIA-TORRES informed me that he was robbed of two ounces of marijuana ("Ran off with 2 oz of exotic").  I did not respond to these text messages and had no further contact with GARCIA-TORRES until February 2022. All text and media messages between GARCIA-TORRES and my UC telephone are preserved.

<u>GARCIA-TORRES' second attempt to purchase a firearm</u>

10.     On February 22, 2022, at 11:16 a.m., GARCIA-TORRES still utilizing (978) 398-4343 again sent text messages to my UC telephone stating, "Jenny gave me this number said you get me a strap."  I believe that GARCIA-TORRES stated that he was referred to my UC telephone number because he heard that I could (in my undercover capacity) sell him a firearm ("get me a strap.").  During this same exchange, GARCIA-TORRES indicated that he had spoken to me before and could show me the conversation. GARCIA-TORRES asked, "Can you get your hands on a Walther (2020 release)[?]" and then stated he had a picture of one. GARCIA-TORRES identified himself with the name "Jason."

11.     On February 28, 2022, GARCIA-TORRES sent me a video of what appeared to be a Walther pistol on a mattress. I believe that GARCIA-TORRES asked me for a 2020 model Walther pistol and sent a video displaying the type of firearm he was interested in purchasing. Also in the video, GARCIA-TORRES stated, "I got Frenchies for sale too," and the video depicted several French bulldog puppies in a residence.

12.     On March 11, 2022, I sent a text message to GARCIA-TORRES stating, "We ever goin to do business[?]" GARCIA-TORRES responded, "I ended up trading mine for a glock 43." I understood this to mean GARCIA-TORRES traded his Walther pistol from the video for a Glock, Model 43 pistol. GARCIA-TORRES sent me the following photograph of a Glock, Model 43 pistol with a grip sleeve/cover.



13.     During this same conversation, GARCIA-TORRES sent me a photograph of what appeared to be a Glock pistol next to a Walther, Model CCP pistol. I believe that GARCIA-TORRES showed me the Walther pistol that he traded for the Glock pistol. The two pistols appear to be on the same mattress as the video from February 28, 2022.



**GARCIA-TORRES' resides at the Target Location**

14.    GARCIA-TORRES listed the Target Location as his residence with the Registry of Motor Vehicles, specifically listing the apartment as floor one.  Further, I have reviewed resident-generated police reports to the Haverhill Police Department. This is a recent feature of the police department for residents to self-generate reports to the Haverhill Police. On December 23, 2021, February 15, 2022, and February 22, 2022, GARCIA-TORRES generated police reports to the Haverhill Police. On each report, GARCIA-TORRES listed his residence as the Target Location and his cellular telephone number as (978) 398-4343, the same telephone number he used to communicate with my UC telephone.

15.    On March 17, 2022, ATF Special Agent Sean Sullivan conducted surveillance outside the Target Location and observed a male who appeared to be GARCIA-TORRES exit the Target Location and open the rear hatch of the Target Vehicle.  The male was with a small dog. The male then entered the Target Vehicle and left. I am aware that GARCIA-TORRES drives a Honda because on February 22, 2022, he sent my UC telephone a video of him driving a vehicle with a Honda emblem on the steering wheel.

16.     On March 18, 2022, investigators again conducted surveillance of the Target Location. That day, I observed a male who appeared to be GARCIA-TORRES exit the Target Location.  The male opened the front passenger door of the Target Vehicle. A short time later, the male closed the door and returned into the Target Location.

17.     I am aware that GARCIA-TORRES is a convicted felon who is prohibited from possessing firearms. He was previously convicted in Hampden Superior Court (Docket 1479CR01002) of Larceny from a Person, in violation of M.G.L. c265 s25(b) and sentenced to two years of imprisonment. I am also aware that Walther and Glock do not manufacture firearms in Massachusetts and that the firearms in the photographs sent to me by GARCIA-TORRES were transported into Massachusetts through interstate commerce.

### GUN TRAFFICKERS' USE OF RESIDENCES AND VEHICLES

18.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.  It is generally a common practice for illegal firearms traffickers to maintain records relating to their illegal firearms trafficking activities in their residences and vehicles. Because firearms traffickers will need to have a source of supply, if they themselves are not able to lawfully purchase firearms, they tend to maintain and store records of sources of supply, amounts paid to sources of supply and other records relating to their customer base and information concerning the transactions. Such recordkeeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain what is owed and to whom, in terms of money, firearms, and ammunition. Often illegal firearms traffickers keep ledgers or "pay and owe" records to show balances due for firearms sold in the past ("pay") and for payments expected ("owe") as to the illegal firearms trafficker's customers.

b.  Additionally, illegal firearms traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their illegal firearms trafficking business. Such records can be kept physically on paper, or digitally on cellular phones. I am also aware that illegal firearms traffickers often maintain such documents related to their illegal firearms trafficking activities at their residences or vehicles for an extended period of time, regardless of whether they are physically in possession of firearms on the premises or in their vehicles.

c.  Even when illegal firearms dealers store their firearms outside their residences or vehicles, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts that are commonly stored in a residence or vehicle.

d.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for illegal firearms traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from illegal firearms sales or monies to be used to purchase firearms.

e.  Many experienced illegal firearms traffickers will often engage in money laundering to conceal the source of their criminal proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, illegal firearms traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with illegal firearms trafficking would also typically be maintained in residences. Based upon my training and experience, as well as the training and experience of other law

enforcement agents I have worked with, I am also aware that illegal firearms traffickers generally try to hide cash and sensitive documents related to their illegal firearms trafficking in safes or other containers so that other individuals who are at their residence do not discover these materials.

f.  During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises or vehicle is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal firearms is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police. Similar proof of control, or ownership of a vehicle is commonly found in a vehicle, such as mail, deeds, leases, rental agreements, photographs, bills, statements, identification documents, or keys.

g.  Based on my training and experience, I know that most illegal firearms dealers regularly use cellular telephones to communicate about their illegal firearms trafficking activities with customers, suppliers, and other coconspirators, and to also ascertain firearms and ammunition availability and prices from websites. In my training and experience, I also am aware that

illegal firearms traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication and are central to the negotiation and coordination of firearms dealing, illegal firearms dealers typically keep the phones in close proximity or at their residences or vehicles. Additionally, in my experience, many illegal firearms dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by illegal firearms dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from illegal firearms dealers' residences.

## GUN TRAFFICKER'S USE OF CELLULAR TELEPHONES

19.     Based on my training and experience, I know that illegal gun trafficking is a clandestine business and that individuals who traffic in illegal firearms are usually unwilling or unable (because of criminal records, their youth, other aspects of their personal backgrounds or their intent to sell guns illegally to prohibited persons) to purchase guns legally. Thus, legal gun brokers, firearm stores and/or trade shows are not available to them as places from which they can acquire firearms and/or ammunition for resale.

20.     As described above, GARCIA-TORRES has used a cellular telephone to facilitate his illegal possession and trafficking of firearms.  Based on my experience and training, I know that records relating to these communications, including text, photo, and video messages, are likely stored on his cellular telephone because he sent such messages to my UC telephone engaging in illegal

firearm dealing.

21.     I also know from having worked as an ATF Special Agent that the majority of firearms and ammunition recovered in Massachusetts crimes have been shipped or transported in interstate commerce and many have been brought into Massachusetts illegally. The relationship between Massachusetts gun traffickers and their sources of supply are thus one of the most important assets of any gun trafficking operation.

22.     Based on the foregoing, I also know that illegal gun traffickers operating in Massachusetts commonly use their cellular telephones to both communicate with and maintain for long periods of time the names, addresses and/or telephone numbers of their suppliers (many of whom are likely to be out of state and thus not easily reachable except by phone) and that they also maintain records of communications with these individuals in the form of telephone call logs, chats, texts or email messages.

23.     Even when a gun trafficker locates suitable firearms that are available to him for sale, he may still have to get those guns to Massachusetts. In some instances, the source of supply may arrange the transport while in others, the Massachusetts trafficker will arrange for transportation himself.  Either way, transportation arrangements are also likely to be made through cellular communication. Because the identity and location of individuals who are willing to transport guns into Massachusetts is also critical information supporting any gun trafficker's business, this information is also likely to be stored and maintained on a trafficker's cellular telephone for long periods of time.

24.     Based on my training and experience, I know that the "sales" side of gun trafficking is another crucial part of this business. Individuals bringing illegal guns into Massachusetts will generally want to sell those guns to trusted customers as soon as they can in order to convert their inventory into cash and to avoid maintaining possession of such guns for extended periods of time.

Thus, gun traffickers are likely to maintain contact information for their customers and communications by cellular telephone.

25.     By their very nature, firearms are heavy, difficult to conceal in public, and easily identified by others. Thus, illegal firearms need to be transported, displayed, and sold by clandestine means. Through my training and experience, I know that persons who unlawfully possess and/or traffic firearms and ammunition utilize the digital recording features of their cellular telephones phones to store photographs of their inventory and market it. Cellular phones are capable of showing trafficker's product (such as firearms, ammunition, firearm accessories, illegal drugs, paraphernalia, or other contraband) via pictures that can be emailed, texted, or displayed on some internet-based platform such as social media sites. I also know that when individuals utilize their cellular telephone to negotiate firearms transactions, individuals may send photographs or videos via their cellular telephone, which will depict the make, model, physical condition and functionality of the firearm being offered for sale.

26.     Based upon my training and experience, I also know that gun traffickers will often "dump" (or change) their cellular telephones and cellular telephone numbers in an attempt to conceal their identity and thereby avoid detection.  In making such changes, individuals will most often transfer their contact lists and other stored data from their old cellular telephones to their new cellular telephones to maintain contact with individuals involved in their business. I know individuals will also transfer photographs and videos to their new cellular telephones, which may depict themselves and others possessing or discharging firearms that may be for sale.

## THE RELEVANT TECHNOLOGY INVOLVING CELLULAR TELEPHONES

27.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and

receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

28.     Based on my training and experience, and information provided to me by other agents, I know that individuals who illegally traffic firearms commonly use cellular telephones to communicate about and further their illegal activities. They use their cellular phones in order to communicate with suppliers, potential buyers, or other individuals potentially involved in unlawful business transactions and will maintain information about these individuals in their contacts lists, in saved text messages and in other places. These communications occur in a variety of ways, which include, but are not limited to: text messaging (often used in lieu of phone calls to avoid speaking over the telephone), and messaging through applications such as Snapchat, WhatsApp, and Facebook.

29.     Based on my training, experience, and information provided by other agents, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

30.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

31.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints or face are among those that will unlock the device, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location to press their finger(s) against the sensor of the locked device(s) or place the device(s) in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s) and identify the device sought in Attachment B.

32.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the device(s) or place the device(s) in front of their faces for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

### CONCLUSION

33.     Based on the information described above, I have probable cause to believe that (a) GARCIA-TORRES, and others, have committed, are committing, and will continue to commit one or more of the Target Offenses; (b) the Target Location is being used to facilitate the ongoing firearm possession and trafficking activities of GARCIA-TORRES; and (c) the Target Vehicle is being used to facilitate the ongoing firearm possession and trafficking activities of GARCIA-TORRES.

34.     Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Target Location and Target Vehicle described in Attachments A-1 and A-2, respectively. Accordingly, I request authorization to search the Target Location and Target Vehicle for the items identified in Attachment B. As the investigation into these unlawful activities is ongoing, I further request that this affidavit, applications, and search warrants be sealed.

Sworn to under the pains and penalties of perjury,

/s/ Brian Higgins
_____
Brian Higgins
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Attested and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 on March 21, 2022



*Page Kelley*
Hon. M. Page Kelley
Chief U.S. Magistrate Judge

## ATTACHMENT A-1

### 20 Boston Street, Apartment 1,  Haverhill, Massachusetts

### ("Target Location")

The Target Location is a brown colored two and half story wood frame residential dwelling.  The number "20" is affixed to right side of the door frame.  Apartment 1 is the first floor of this two and half story wood frame dwelling residential dwelling. A photograph of the Target Location is attached.



The premises to be searched shall include all common areas of the Target Location, including common rooms, crawl spaces and storage areas.  This shall also include containers such as safes, vaults, file cabinets, drawers, backpacks, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans, located in or around the Target Location, that are owned or under the control of the occupants of the Target Location.

## ATTACHMENT A-2

### ("Target Vehicle")

The Target Vehicle is a red 2019 Honda HR-V, bearing Massachusetts registration 2WSW44. The vehicle is registered to Jesus GARCIA-TORRES at 20 Boston Street, Apartment 1, Haverhill, Massachusetts.  A photograph of the Target Vehicle is attached.



## <u>ATTACHMENT B</u>

## <u>ITEMS TO BE SEIZED</u>

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. §§ 922(g)(1) (felon in possession of firearms and ammunition) and 922(a)(1) (illegal dealing in firearms), for the period of June 1, 2020 through the present day, including those related to:

    A.      Records and tangible objects pertaining to the following people, entities, physical addresses, telephone numbers:

        1.      Jesus GARCIA-TORRES born 1996;

        2.      20 Boston Road, Apartment 1, Haverhill, Massachusetts;

        3.      Telephone number, (978) 398-4343;

    B.      Records and tangible objects pertaining to 18 U.S.C. §§ 922(g)(1) and 922(a)(1);

        1.      Safes and other secure storage containers for firearms and ammunition;

        2.      Firearms, ammunition, holsters, receipts, records, ledgers, notes, bills of sale, manuals, package labels, and other documents pertaining to the receipt, possession, and distribution of firearms;

        3.      Firearm retail boxes and/or cases; and

        4.      Firearm cleaning tools and supplies;

    C.      Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by GARCIA-TORRES or other co-conspirators, including, without limitation:

        1.      Bank, credit union, investment, money transfer, and other financial accounts;

        2.      Credit and debit card accounts;

        3.      Tax statements and returns;

        4.      Business or personal expenses;

        5.      Income, whether from wages or investments;

        6.      Loans;

    D.      Records and tangible objects pertaining to the travel or whereabouts of GARCIA-TORRES and any coconspirators from June 1, 2020 through the date of execution of the search

warrant;

      E.     Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

      F.     Photographs, video footage, and audio recordings which document GARCIA-TORRES or an association with other co-conspirators and/or which display firearms, or other items associated with the act of gun trafficking;

      G.     Electronic data and information pertaining to records of these devices serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing other related electronic data;

      H.     For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

            1.     Evidence of who used, owned, or controlled the computer equipment;

            2.     Evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

            3.     Evidence of the attachment of other computer hardware or storage media;

            4.     Evidence of counter-forensic programs and associated data that are designed to eliminate data;

            5.     Evidence of when the computer equipment was used;

            6.     Passwords, encryption keys, and other access devices that may be necessary to access the computer equipment; and

            7.     Records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

II.    All computer hardware, computer software, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the Target Location described in Attachment A-1, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the subject device and/or to hold the device in front of their faces.

**DEFINITIONS**

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes